(54 South. 870.)

No. 18,139.

Succession of LANDRY.

MIGUEZ v. DELCAMBRE et al.

(March 27, 1911.)

*(Syllabus by the Court.)*

1. HUSBAND AND WIFE (§ 276*)—SIMULATED SALE OF COMMUNITY PROPERTY—SCOPE OF RECOVERY—SUCCESSIONS.

In a suit by the administrator of the wife's succession, attacking as simulated and fraudulent and unauthorized, a sale of community property made by the surviving husband whilst acting as administrator, it cannot, under any circumstances, be decreed that more than a half interest in such property belongs to the succession of the wife.

[Ed. Note.—For other cases, see Husband and Wife, Dec. Dig. § 276.*]

2. PARTIES (§ 76*) — NECESSITY FOR EXCEPTIONS IN LOWER COURT.

An exception to the capacity of an administrator to sue for the recovery of property, as belonging to the succession administered by him, comes too late when filed in this court after the appeal is lodged here. Such exception should be filed in limine litis.

[Ed. Note.—For other cases, see Parties, Cent. Dig. §§ 117–121; Dec. Dig. § 76.*]

3. HUSBAND AND WIFE (§ 276*)—SUCCESSIONS—SIMULATED SALE.

A transaction, consisting of an adjudication of real estate at a judicial sale and the subsequent execution of notarial acts, purporting to convey the property adjudicated, cannot, as a whole, be regarded as a simulation, where there was a real purpose to transfer the title to the person in whom it was ultimately vested, and where money was actually paid out and received, and actual obligations assumed and extinguished, even though some of the conveyances were without consideration, and the title was vested in the parties thereto merely in order that it might be transferred, or in order to create a mortgage and vendor's lien in favor of one of them.

[Ed. Note.—For other cases, see Husband and Wife, Dec. Dig. § 276.*]

4. HUSBAND AND WIFE (§ 276*)—SUCCESSIONS—SIMULATED SALES.

Although the surviving partner in community, administering his deceased wife's succession, may purchase the property of the community at succession sale, either by himself or through another, and, being entitled to the usufruct of the decedent's interest, may retain the price, save so much as may be required to pay the community and succession debts, yet, if the property be adjudicated to a third person, as for cash, and the adjudicatee pays nothing, he acquires no title, and the administrator, acquiring by mesne conveyances from him, can acquire none. And though there may be no moral obliquity in the transaction, he and the adjudicatee to whom he subsequently retransfers the title must be regarded, quoad the interest of the succession, as possessors in bad faith.

[Ed. Note.—For other cases, see Husband and Wife, Dec. Dig. § 276.*]

5. IMPROVEMENTS (§ 4*)—IMPROVEMENTS MADE BY POSSESSOR IN BAD FAITH—RIGHT TO RECOVER.

The possessor in bad faith, whether the bad faith be technical or moral, is entitled to recover from the owner of the soil only for those improvements of which the owner may

order the removal, but which he elects to retain. He cannot recover for improvements which are inseparable from the soil. This does not, however, apply to the expenses incurred in the preservation of the property, and does not prevent the possessor in bad faith from offsetting the claim of the owner for fruits and revenues by a claim, on his part, for expenses incurred in useful improvements of whatsoever kind, to the extent ·that the owner is thereby benefited. Voiers v. Atkins, 113 La. 303, 36 South. 974, affirmed. ·

[Ed. Note.—For other cases, see Improvements, Cent. Dig. §§ 4–26; Dec. Dig. § 4.*]

6. JUDGMENT (§ 707*) — CONCLUSIVENESS — PARTIES CONCLUDED.

The rights of a person arising from putative sales to and by him of real estate, and from a mortgage and vendor's privilege, of which he appears to be the beneficiary, cannot be adjudicated upon in a proceeding to which he is not a party.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1230; Dec. Dig. § 707.*]

Provosty, J., dissenting.

Appeal from Nineteenth Judicial District Court, Parish of Iberia; James Simon, Judge.

Action by Dominique Miguez, administrator of. Adelaide Landry, against Louis Delcambre and others. From the judgment, defendants appeal. Reversed and rendered.

See, also, 125 La. 176, 51 South. 108.

Burke & Burke and Ventress J. Smith, for appellants. Weeks & Weeks, for appellee.

## Statement of the Case.

MONROE, J. Dominique Miguez, brings this suit, as administrator of the succession of Adelaide Landry, his grandmother, against Louis Delcambre, his grandfather, and Désiré and Laodice Delcambre, his uncles, to have it decreed that certain transfers of the title of a plantation (which· had been acquired by Louis Delcambre during the life of his wife as community property, and of which Laodice and Désiré are now in possession as owners) were void as "fraudulent simulations," and for other reasons, and for certain other relief; the facts leading up to the suit being substantially as follows:'

Mrs. Delcambre (Adelaide Landry) died in December, 1891, leaving as heirs the children and grandchildren of her marriage with Louis Delcambre, to wit, Désiré and Laodice, sons; Constance (wife of G. Pessan), Zelmire (wife of F. Hébert), Alida (wife of Jos. Viator), daughters; and eight children (including plaintiff herein) of her daughter Elina (or Evina), deceased wife of Luzin Miguez, grandchildren. In August, 1893, Louis Delcambre opened his wife's succession by petitioning the court for an inventory and letters of administration, and, on December 11th, following, he filed the inventory, took the oath as administrator, and (probably on the same day) received his letters, though, as copied in the transcript, the letters bear no date, save the year 1893. Nearly nine years later (on June 7, 1902) plaintiff herein brought suit, alleging that, though the letters of administration had been issued by the clerk, no order of appointment had ever been made by the judge, and hence that the letters were unauthorized and void; and, further, that the pretended appointment was not only illegal, to the knowledge of his grandfather, but that it and the subsequent administration constituted a scheme concocted by him for the purpose of defrauding his wife's heirs and creditors, and he prayed that the letters be decreed null, and that he (plaintiff) be appointed administrator, all of which, after a litigation and delay extending over a period of several years, was done. Miguez v. Delcambre, 109 La. 1090, 34 South. 99; Id., 113 La. 61, 36 South. 888; Id., 114 La. 1032, 38 South. 820; Id., 118 La. 1062, 43 South. 703. Thereupon, as administrator, plaintiff brought two suits, the one for the resolution of the sale of certain real estate, which, at the time of the death of Mrs. Delcambre, belonged to Hébert (a son-in-law), and upon which there existed a mortgage alleged to have been an asset of the community; and the other the suit now under consideration. In the suit first mentioned, the district court reached the conclusion that the charges of fraud and illegality relied on by

plaintiff were not sustained, and gave judgment for defendant. On the appeal, it was held by this court (considering an exception filed in limine to that effect) that, as the succession of Mrs. Delcambre was not shown to owe any debts, the administrator had no other function to discharge than to turn the assets, tangible and intangible, over to the heirs. In view, however, of the character of the charges which had been made and adjudicated upon, this court went on to consider the case upon its merits, and concurred in the conclusion reached by the district court. Miguez v. Delcambre, 125 La. 176, 51 South. 108.

The proceedings and transactions which are here attacked were as follows:

Louis Delcambre, holding letters of administration and believing himself to be the duly appointed administrator of the succession of his deceased wife, on February 9, 1894, presented a petition to the court, showing that the community owed certain debts (including one of about $5,000, secured by mortgage on the property here in dispute), and praying that the court order the sale of the community property, movable and immovable, for their payment, which order was made and, on March 31st following, executed by the public sale of the property, or the greater part of it, at which sale most of the members of the family and many other persons were present, and to which no objection was made until plaintiff began this litigation. Plaintiff himself was present, and, either then or previously, expressed the hope that some member of the family would buy the plantation, and the opinion that his uncle, Désiré, was about the only one who was able to do so. It would appear, however, that none of them were in a position to make the purchase, but, in view of the fact that Pessan, the holder of the mortgage claim to which we have referred, was the only creditor who was pressing for payment, Désiré Delcambre came to an understanding with his father, on the one hand, and with Pessan, on the other, to the effect that he should bid in the plantation, without being required to pay any cash, and that Pessan would wait for his money, provided the interest upon it should be paid punctually; and the plantation was accordingly adjudicated to Désiré for $11,000. After the adjudication Pessan declined to carry out his agreement, and insisted upon being paid the principal of the amount due, as well as the interest, and Désiré so informed his father, telling him that under the circumstances he would be unable to go on with the matter. Louis Delcambre, however, suggested that an agreement might still be made, and that they should see their lawyer, which they did, with the result that they were referred to a Mr. Gougenheim, who, upon a certain condition, agreed to advance the money needed to pay Pessan; the condition being that he should be secured for such advance by a mortgage and vendor's privilege. Désiré thereupon consented to assume the rôle of purchaser and vendor; the de facto administrator made out a procès verbal, reciting that the property had been adjudicated to him for $11,000; he (Désiré), on May 2xth following, executed an act purporting to convey said property to Gougenheim for the same price (though he paid nothing to the administrator and received nothing from Gougenheim), and Gougenheim on the same day executed an act purporting to convey the property to Louis Delcambre for $11,500, of which the receipt of $7,000 cash was acknowledged, and for the balance Delcambre gave two notes of $2,250, each, secured by mortgage and vendor's privilege; the facts in that connection being that Delcambre paid Gougenheim nothing, and that the two notes were given in return for money which Gougenheim then advanced, and which, in whole or in part, was used in paying the debt due to Pessan. In the meanwhile (on April 17, 1894) Delcambre, as administrator, had caus-

ed to be made a supplemental inventory in the succession of his wife, showing that he had, belonging to the community, certain notes, executed by his son-in-law, Hébert, secured by mortgage and vendor's lien, amounting to $6,500; another note by the same maker, but unsecured, for $1,600; three notes made by Viator (another son-in-law), secured by mortgage and amounting to $1,250; and two mortgage notes made by his son, Laodice Delcambre, amounting to $1,970; the aggregate amount of said notes being $11,300. And two days later (April 19, 1894) the administrator de facto filed a provisional account, showing the gross proceeds of the sale of March 31st as cash in his hands, to which he added certain property left unsold, making a total active mass of $30,053.41, as against which there are charged community debts to the amount of $8,966.46, including $1,038.77 due to the succession of his deceased wife, thus leaving a balance of $21,086.95 of community assets, to be equally divided between the surviving husband and the heirs of the wife, less $110 (for funeral expenses and sermon), to be paid from the share of the wife, of which share the husband, as surviving partner in community, claimed the usufruct.

It appears from the record that citations, to show cause why the account so filed should not be approved and homolgated, were directed to all the heirs of age, and to Luzin Miguez, as tutor of his four minor children, and that they were served upon Désiré, Laodice, Constance (wife of Pessan), Zelmire (wife of Hébert), and Miguel (tutor), but there is no return or proof of service on Alida Delcambre (wife of Viator), Azema Miguez (wife of Broussard), Minora Miguez (wife of Rodriquez), Dominique Miguez, or Orézile Miguez. There was, however, no opposition to the account, and in due time, on May 19, 1894, there was a judgment of homologation, reading in part as follows:

"It is, therefore, * * * decreed that the * * * account be approved and homologated, in all its parts * * * and the debts therein set forth be paid. And, further, it is * * * decreed that Louis Delcambre be recognized to be the owner * * * of one-half interest in and to all the property * * * formerly belonging to the matrimonial community * * * between him and his predeceased wife, Adelaide Landry, and that he be recognized to be the usufructuary of the (other) undivided one-half right, title and interest of the said property formerly belonging to the said community, according to law."

After the transfers of title to which we have referred, Désiré and Laodice Delcambre took charge of the plantation in question as tenants; Laodice living on the place and managing it, and the plaintiff herein also living there for four or five years, rent free, the understanding being that they (Désiré and Laodice) should give their father one-half the profits and make some improvements, in lieu of rent. They, however, made no profits and now claim that such improvements as they made were based upon an agreement that they were eventually to buy the property. However that may be, on December 18, 1900, the father sold the plantation to Désiré for $11,500, of which, according to the recitals of the act of sale, $7,200 was paid in cash, and for the balance of $4,300 the purchaser gave his note, secured by mortgage; and, on the same day Désiré sold an undivided half interest in said property to Laodice for $5,750, in part payment of which amount Laodice gave a note for $3,600, secured by mortgage, and for the balance of $2,150 assumed the obligation to pay one-half the amount of the note for $4,300 which had been given by Désiré; and thereafter the two brothers cultivated the plantation as owners, and improved it, until they were interrupted (in 1902) by plaintiff's attack upon the legality of the proceedings upon which their claim of ownership is founded.

This present suit was instituted in April,

1908, and plaintiff prays for relief as follows:

"Wherefore petitioner prays that the said pretended adjudication and sale * * * be declared a fraudulent simulation, without price or consideration, and conceived, planned, and executed by defendants for the purpose of defrauding said estate, its heirs and creditors; * * * that the said pretended sale from Désiré Delcambre to Charles Gougenheim be likewise declared a fraudulent simulation; * * * and that said pretended sale from Charles Gougenheim to the said Louis Delcambre be also declared absolutely null and void for the same reason. And that the said contracts be declared in their entirety, as well as separately, a simulation, conceived, concocted, and executed in fraud, * * * all to the knowledge of the said Louis Delcambre and Désiré Delcambre, as well as Laodice Delcambre, and for the purpose of placing said property and title in the name of the said Louis Delcambre, without any one having paid anything whatsoever therefor to the said succession and community to which said property belonged; that they further be decreed void for want of right or authority in said pretended vendors to sell said property or to effect said transaction concerning it. Further, that there be judgment decreeing the simulated character of said transactions; and, further, decreeing said property to belong to the succession of Adelaide Landry, free from any incumbrance or obligation of any kind whatsoever, and that the petitioning administrator, in his said capacity, further have judgment against the said Louis Delcambre for the sum of $15,000, rentals of said property during his said term of possession thereof, and against the said Désiré and Laodice Delcambre in the sum of $14,700, rentals during their term of their possession thereof until date; and, further, for rentals at the rate of $2,000 per annum for each additional year. * * * And in the alternative * * * he prays that defendants be condemned, in solido to pay petitioning administrator, as such, the sum of $11,500, being the price of said pretended adjudication * * * to Désiré Delcambre. * * *"

All the defendants pleaded the prescription of one and five years, and Louis Delcambre answered, affirming the legality of his title and his good faith throughout. He alleges, among other things, that:

"Whilst it is true that events arising after the adjudication, made it impossible for Désiré Delcambre to procure the means necessary to make the payment for the property, the said Désiré Delcambre and your respondent entered into an agreement, subsequent to said sale, * * * to allow your respondent to become the owner of said property, as he had an absolute right to do; * * * that the transfer of said property by said adjudicatee to Charles Goug-

enheim, and from the said Gougenheim to your respondent, was simply a means of procuring the money necessary to enable him to comply with the terms of the bid * * .*; and the amount arising from this sale was made the subject of accounting in the tableau filed by your respondent, which was duly homologated by the court, the said funds being used for the purpose of paying the debts of the estate of Adelaide Landry, as recited in said account * * *; that the only debts due by the community were those set forth in the account * * *, and that all of those debts, with the exception of a small amount due the heirs of Adelaide Landry from her separate estate, have been liquidated * * *; that, even, if the sales, as originally made, were set aside, your respondent would have remained the owner of one-half of the property, which he would have had the right to have disposed of to Désiré Delcambre, and the rents and revenues of the other portion, if any there were, would have been due him as usufructuary," etc.

He further alleges that, with a view of terminating the litigation, he (in December, 1904) tendered to plaintiff and each of the heirs a proposition, in which Désiré and Laodice Delcambre concurred, as follows, to wit:

"I propose an immediate sale, by way of partition, of all the property belonging to the estate, and an accounting between my children and myself. What will remain after taking due account of all debts will belong one-half to me, and one-half to the heirs. It is proper that I should have the usufruct granted me by law, in order that (having attained my eighty-second year) I may not be deprived of those comforts of life to which my labors entitle me. I am willing, however, to invest the funds, subject to usufruct, in such manner as the heirs shall desire or the court may order, and then receive nothing but the income thereof. In order that there may be no impediment to an immediate settlement, and adhering strictly to the legality and validity of their title, Désiré and Laodice Delcambre offer to return to the succession of Adelaide Landry the half of the property to which her heirs were entitled before the succession sale, to be sold again with the entire property; they owning one-half for the purposes of the partition. As it was from the funds derived from the sale of this property and the movables that the debts were paid, there should be refunded to Désiré and Laodice Delcambre their proportion of the purchase price by them paid, which went to the payment of those debts. The estate profited to that extent and should make reimbursement. I would be liable to them in the difference. This may practically be the same as refunding me the amounts by me paid for the estate, and I in turn reimbursing Désiré and Laodice Delcambre. As to the improvements, they might be appraised by the experts

selected on both sides, and sold with the property. The appraised value would be given to Désiré and Laodice Delcambre out of the proceeds. If the heirs will agree to refund to Désiré and Laodice Delcambre the $11,500 (plus improvements by them paid) out of the proceeds of the sale of the plantation, or otherwise, they tell me they will consent to a cancellation of the sale in full. As to the notes referred to in the second inventory, I am ready to make accounting for them, upon the partition of the property, in the settlement between my children and myself. I desire this to be considered as made without waiver of any rights in the premises, but solely with the aim of ending costly litigation."

The answer of Désiré and Laodice is substantially the same as that of their father. They pray that their title be maintained, or, in the event of their eviction, that they be allowed the value of the improvements placed by them on the property.

There was judgment in the court a qua, decreeing the plantation in question to be the property of the community heretofore existing between Louis Delcambre and his deceased wife, Adelaide Landry; decreeing the succession of said Adelaide Landry to be the owner of an undivided half interest therein; decreeing "the pretended sale" of said plantation by Louis Delcambre, acting administrator, to Désiré Delcambre to be a mere sham and simulation, and the "pretended" sales by Désiré Delcambre to Charles Gougenheim and by Gougenheim to Louis Delcambre to be null and void; and decreeing that the title to said property is in no wise affected by said transactions, but remains in the community; "that is, an undivided half thereof, as belonging to the succession of Adelaide Landry, deceased." The judgment holds Désiré and Laodice Delcambre indebted to the community for rents and revenues, at the rate of $3 per acre per annum, on 150 acres of land, from April 16, 1908, until the delivery of possession, but reads further:

"The rights of Louis Delcambre to the usufruct of said estate being still in abeyance, under the decision of the Supreme Court of this state, the question as to whether the one-half interest of Mrs. Delcambre's portion of the community shall be due to him, or due to said estate, is undecided; same being left open for further determination."

The judgment then awards to Désiré and Laodice Delcambre, upon their reconventional demand, $700 for pumping plant; $100, each, for three cabins; $125, each for three cabins; $250 for stable and shed; and $200 for boarding house and kitchen, the aggregate amount to be paid by the community; and condemns the defendant for the costs of the main action and the succession for those of the reconventional demand. Defendants have appealed, but plaintiff has neither appealed nor answered the appeal of defendants.

### Opinion.

[1] As the plaintiff bases his action on the fact that the plantation in question belonged to the community which existed between his grandmother, now deceased, and his grandfather, who survives, it is evident that under no circumstances can it be decreed that more than a half interest therein belongs to the succession of his grandmother; and, if it be a fact, as was held in the case heretofore decided, that he represents neither creditors of his grandmother nor heirs, save himself (his interest, in view of the fact that one of his sisters appears to have died since the death of the grandmother, being about one thirty-fifth of one-half, or, say, one-seventieth, of the whole of the property claimed), he really has no standing, as administrator, to prosecute this suit, even with respect to the half interest.

[2] No exception to his capacity seems, however, to have been filed in the lower court, and as filed here, after the return of the appeal, the exception comes too late to be considered. Code Prac. arts. 333, 344; Houston, Adm'r, v. Childers et al., 24 La. Ann. 472; Parish, etc., ex rel. Parish, Treasurer, v. Shexnaydre, 34 La. Ann. 850; Receiver v. Seligman, Hellman & Co., 35 La.

Ann. 113; Montfort v. Schmidt, 36 La. Ann. 750; Campbell v. Railroad Co., 104 La. 183, 28 South. 985. [3] The allegation that the transactions here attacked were "simulations" is not sustained by the evidence, since those transactions were intended to accomplish actual, and not merely apparent, results; and actual, and not merely apparent, obligations were assumed and extinguished to that end. In other words, the intention of the parties was to vest real, and not simulated, titles; to give to Gougenheim a real, and not a pretended, mortgage and privilege as security for the money which he actually advanced, and which was actually used to pay the debt that the community owed to Pessan; and the notes given by Louis Delcambre to Gougenheim and by Désiré to Louis, and the assumption by Laodice of one-half of the note given by Désiré, were all intended as real, and not as simulated, obligations. Nor does the evidence sustain the allegation that the transactions in question were parts of a scheme "conceived, concocted, and executed in fraud," which allegation imputes fraud to Louis Delcambre in assuming the administration of his deceased wife's succession, and in every step thereafter taken by him. As to his assumption of the administration, we have already had occasion to express the opinion that the charges of fraud were unfounded (Miguez v. Delcambre, 125 La. 193, 51 South. 108), and that opinion has not been changed by anything that we find in the transcript now before us. As to the particular transactions here attacked, it will be borne in mind that at the death of Mrs. Delcambre all that the surviving husband had in the world, as the result of the labor of a long lifetime, was his interest in the property of the community, after the payment of the community debts, and all that the succession of the deceased wife was entitled to was a like interest in the same property (plus $1,038.77, constituting her separate estate, and represented by a debt due by the community), subject to the same condition, and to the further condition that the surviving husband was entitled to the usufruct of said interest. The first inventory showed community property, consisting of real estate, live stock, farming implements, and household furniture, the whole appraised at $17,516.90, but no money; and there were debts due by the community to the amount, in round figures, of $9,000, including one of about $5,000 due to Pessan, and secured by mortgage on the plantation here in question, and on all the property, immovable by destination, which was thereto attached; and including a debt of about $1,600, due to J. Gall, also secured by mortgage. In that situation the administrator de facto applied for and obtained an order for the sale of all the property of the community for the payment of its debts, and there can be no doubt that he could legally have bid the whole of it in, and (if he sufficiently complied with the law in other respects) have retained the proceeds, so far as they were not needed to pay the debts, one half in his own right and the other half as usufructuary. R. S. § 12.

He was, however, without means, and, whilst it was no doubt contemplated that the smaller debts would be paid from the proceeds of the sale, and, we infer, that Gall was willing to wait, neither the surviving partner in community nor anyone else could have bid in the plantation without paying Pessan in cash, or making some arrangements with him. The general sentiment in the family appears to have been that the plantation should be bought in by one of its members, and the present administrator expressed the hope that that would be done, and the opinion that his uncle, Désiré, was the one who should do it. But as Désiré did not have the money, an understanding appears to have been had between him and the administrator de facto on the one hand,

and Pessan on the other, to the effect that the plantation should be adjudicated to Désiré as for cash, and the receipt of the price acknowledged by the administrator; and that Pessan, retaining his mortgage or being given a new mortgage, should allow his claim to run on, provided the interest was paid punctually, and perhaps, semiannually. Whether Désiré was thereafter to have transferred the plantation to his father, or was in some way to have secured him with respect to the price, for which he was to account, and did account, as administrator, is not shown; the probability being, as we infer from the course subsequently pursued, that he would have transferred the plantation to his father, and that his father would (as, in fact, he did) have thereafter retransferred it to him. However that may be, the facts are that Désiré bid $11,000 for the plantation and became the adjudicatee; that Pessan then declined to comply with his agreement and insisted on having his money; that Désiré informed his father of the situation and told him that he could not go on with the agreement; that his father suggested that something might yet be done, and that they should consult their lawyer; that they did so consult, and that their lawyer found Mr. Gougenheim, who was willing to lend the amount necessary to pay Pessan, provided he (Gougenheim) was secured by mortgage and vendor's privilege; and that, thereupon the property was conveyed to Désiré Delcambre as for cash, though he paid nothing; that he conveyed it to Gougenheim as for cash, though Gougenheim paid nothing; and that Gougenheim conveyed it to Louis Delcambre as for $11,500, though Louis Delcambre paid nothing, but received $4,500 in return for his note for that amount, secured, or purporting to be secured, by mortgage and privilege.

Plaintiff imputes fraud to the administrator de facto in that he provoked the sale of the real estate of the community without having inventoried certain notes, which, he alleges, could have been sold for more than enough to pay the debts. Counsel for the administrator de facto has somewhere, testified that, when he was about preparing his client's account, the latter mentioned the fact that he had the notes, and had by inadvertence omitted to mention them, and that they were thereupon included in a supplemental inventory and in the account, in which latter were also included, as cash received by the administrator, the price at which the plantation had been adjudicated to Désiré Delcambre. From which, and from the fact that the action so taken was entirely voluntary on the part of the administrator, it is evident that he was not attempting to make any fraudulent disposition of the notes, or to escape liability with respect to the price of the plantation, concerning which, it may be here remarked, that there is no suggestion that it was insufficient, or that a better price could have been obtained.

Of the notes referred to, there was one of $5,000 and one of $1,500 which had been executed by Frederick Hébert (a son-in-law) in January, 1883, in payment of the purchase price of certain property, and which were secured by mortgage and vendor's privilege on said property, and there was another note of $1,600, dated March 15, 1884, by the same maker, which was unsecured. Some time prior to the death of Mrs. Delcambre, her husband, at her earnest solicitation, had bound himself and the community, in solido with Hébert, for debts contracted by the latter for machinery to the amount of $4,000 or $5,000, and before and probably after Mrs. Delcambre's death, some of the mortgage notes above referred to had been turned over to the creditor, as collateral security for that debt. All of which was disclosed in the other case to which we have referred, and in which (after stating that

the property there involved had been sold to Hébert for a price represented by the notes in question) it was said:

"Some time after (during the life of Mrs. Delcambre, but precisely at what date does not appear) Hébert bought machinery, to be used for the manufacture of sugar on the plantation so purchased by him, and borrowed the money with which to pay for it from a gentleman to whom Delcambre obligated himself as surety for the debt, and to whom he delivered, as collateral, one or more (probably two) of the notes that he had received from Hébert. Hébert also, and for several years (still during the life of Mrs. Delcambre), obtained advances for planting purposes from Pierre Le Bron, a merchant of New Iberia, and his father-in-law in that case, as in the other, bound himself as surety for the debt, and from time to time as the debt increased, gave Le Bron one of Hébert's mortgage notes as collateral therefor; the fact being that Hébert was uniformly unsuccessful in his business operations, that he was insolvent, almost from the beginning, and (it may as well be stated here) that he did not, at that time or eventually, pay anything on the notes to which we have referred." Miguez v. Delcambre, 125 La. 178, 51 South. 109.

Hébert's notes, so far as any personal responsibility on his part was concerned, were therefore absolutely valueless, and if, as appears to have been the case, one or more of the series of notes secured by the same mortgage were pledged to secure a community debt, it may well be questioned whether the others, more than 10 years old and long past due, could have been regarded as saleable assets of the community. There were three other notes, aggregating $1,250 (past due) included in the second inventory, which had been given by Joseph Viator (another son-in-law) for property which Delcambre had sold to him in 1888; and two notes, aggregating $1,970, which had been given by Laodice Delcambre, in 1890, for property sold to him. Whether such notes would have brought a price at public sale we have no means of knowing, but it is nowhere suggested that the makers would or could have paid them, or that their payment could have been enforced, save by the sale of the mortgaged property (upon which they probably lived) after a litigation, the duration of which was uncertain, and for the termination of which the mortgage creditors of the community, including Pessan, were under no obligation to wait. As the matter stands, Delcambre charged himself with all the notes, including those of Hébert, at their face value, and, whilst he may have made a mistake in dealing with the matter as he did, we are unable to discover that he was actuated by any fraudulent purpose.

[4] It has been stated that Louis Delcambre, as surviving partner in community, might have bought in the property here in controversy, and, save in so far as they were needed to pay the debts of the community, have retained the proceeds as owner and usufructuary (the question whether he took the steps which he certainly might have taken to place his right of usufruct beyond dispute being pretermitted), and it may be urged that what he might have done directly it was competent for him to do through others, and hence that he may be regarded as having a good title, through Désiré Delcambre and Charles Gougenheim. The difficulty, as we see the matter, is that, although Louis Delcambre might have taken his title to the half interest in the property owned by the succession of which he was administrator de facto directly from the succession, and, so far as we can see, from himself as administrator, that course was not pursued. He attempted to vest the title of the whole property in Désiré Delcambre, but the attempt, so far as the interest of the succession was concerned, was unsuccessful, for the reason that he had prayed for an order to sell the property for cash, and, though the order does not specify the terms, the sale purports to have been made for cash. But the adjudicatee paid nothing in cash or otherwise, and hence, never became the owner of the property. Washburn v. Green, 13 La. Ann. 333. And having no title he conveyed none to Gougenheim, who conveyed

none to Louis Delcambre. Considering the transactions as a whole, however, we do not, for the reasons which have been stated, regard them as simulations; nor do we regard them as evincing any fraudulent purpose, since the end sought to be accomplished was the vesting of the title in Louis Delcambre, who might have taken it directly, and who charged himself, upon the account filed by him shortly after the sale with the full amount of the price, as though he had received it in cash, and thereafter, as we understand the record, paid all the debts of the community, save, perhaps, an inconsiderable amount due to the succession of his wife, as also all the debts of that succession.

It is not sufficient, however, that the end sought to be accomplished in the alienation of succession property should be legal. The means adopted must also be legal, and, if they are not, those by whom they are adopted must be held to have known it, and to have acquired the property, alienated by illegal means, in bad faith. A sale of succession property, without an order of court, is an absolute nullity, which is not cured by the prescription of five years (Robert v. Brown, 14 La. Ann. 597); and a sale, upon terms other than those prescribed by the order, is a sale without an order of court (Smelser v. Blanchard, 15 La. Ann. 254). We are therefore of opinion that the sales here attacked, of the interest of the succession of Adelaide Landry in the property in question, have been properly set aside; but we think the judgment appealed from goes rather too far, in decreeing that said interest is in no wise affected by the transactions complained of, since Gougenheim, whose money released the property from the mortgage held by Pessan, is not a party to this suit and his rights, as mortgagee and holder of the vendor's privilege, cannot well be adjudicated upon in his absence. In regard to plaintiff's claim for rents and revenues and defendant's claim in reconvention for the value of improvements placed on the property, as plaintiff has neither appealed nor answered the appeal, the judgment appealed from cannot be amended to his advantage, though it may be amended in the interest of the defendants. The failure of the learned judge a quo to determine the question whether or not Louis Delcambre is entitled to be recognized as usufructuary is attributable to the fact that he and the litigants interpreted the language used by this court in the matter of Miguez v. Delcambre, 118 La. 1070, 43 South. 703, to mean that the question stated could not be determined until all other questions and all other litigation arising between the parties shall have been disposed of, and, since all parties have acted on that interpretation (though we think it rather broader than the circumstances warrant), we shall leave the question where it has been left by the judgment appealed from, with this amendment, to wit, that, whereas that the judgment holds Désiré and Laodice Delcambre liable to the community for fruits and revenues at the rate of $3 an acre on 150 acres of land, from April 16, 1908, and leaves open the question whether one-half of the same is due to the succession of Adelaide Landry or is due to Louis Delcambre, as usufructuary, we are of opinion that they can, under no circumstances, be held liable to Louis Delcambre, either personally or as usufructuary, for fruits and revenues, and that the utmost for which they can be held on that account to the succession is the one-half of the whole amount thus found due.

The learned judge a quo has awarded defendants some $1,800 for particular improvements placed by them on the land; and, whilst plaintiff acquiesces in the award, defendants are asking that it be increased, not only by allowing more for the particular improvements in question, but by making

allowance for other improvements, such as fencing and levees. [5] The rule applicable to the question presented has been stated by this court, in a recent case, substantially as follows:

"The possessor in bad faith, whether the bad faith be technical or moral, is entitled to recover from the owner of the soil only for those improvements of which the owner may order the removal, but which he elects to retain. He cannot recover for improvements which are inseparable from the soil. This does not, however, apply to expenses incurred in the preservation of the property, and does not prevent the possessor in bad faith from offsetting the claim of the owner for fruits and revenues by a claim, on his part, for expenses incurred in useful improvements, to the extent that the owner is benefited thereby." Voiers v. Atkins Bros., 113 La. 303, 36 South. 974.

[6] According to the rule thus stated, defendants would be entitled to the award which they have obtained only in the event that plaintiff elected to retain the particular improvements to which it relates, but, as plaintiff has not appealed and makes no complaint of the judgment whereby the award is made, without condition, we do not feel authorized to amend the judgment for his benefit; nor, so far as the amount is concerned, do we find sufficient reason for amending by increasing it, as suggested by counsel for defendants. As to defendants' claim for fencing, levying, and ditching, whilst it may be used to offset plaintiff's claim for fruits and revenues, we think it may as well be relegated to the district court, to be considered in connection with that (last-mentioned) claim.

It will thus be seen that, whilst we concur with the learned judge a quo in the main proposition, i. e., that the transfers of title of the succession property should be set aside, we do not quite agree with him on several other points. In fact, we find some little difficulty on the main proposition, for the reason that Gougenheim, who was a party to two of the conveyances, is not before the court, and we can affirm the

128 La.—12

judgment only in so far as it may be done without prejudicing his rights. We therefore think it advisable to set aside the judgment as rendered and formulate another in its stead.

It is accordingly ordered, adjudged, and decreed that the judgment appealed from be set aside, and that there now be judgment in favor of plaintiff, Dominique Miguez, administrator, and against the defendants Louis, Désiré, and Laodice Delcambre, decreeing the adjudication by Louis Delcambre, acting administrator, of the half interest of the succession of Adelaide Landry in the plantation here in question to Désiré Delcambre; the putative transfers of said interest by Désiré Delcambre to Charles Gougenheim, by Charles Gougenheim to Louis Delcambre, and by Louis Delcambre to Désiré Delcambre, as also the putative conveyance by Désiré Delcambre to Laodice Delcambre of the undivided interest in said half interest, to be null, void, and of no effect, all, however, without prejudice to any rights which Charles Gougenheim may have, or may assert, as growing out of said conveyances, or either of them.

It is further adjudged that, with the reservation in favor of Charles Gougenheim, as stated, said property, to wit, an undivided half interest in the plantation here in controversy, be decreed to belong to the succession of Adelaide Landry, subject to the payment, as to the creditors, of the debts of the community formerly existing between said decedent and Louis Delcambre, and, as to the owners of the other half interest, subject to the payment of one-half of said debts.

It is further adjudged that the liability of Désiré and Laodice Delcambre for fruits and revenues of the property in question be fixed at one-half of $3 per acre, on 150 acres of land, from April 16, 1908, until said property shall have been delivered up by them, provided, however, that they shall not be held to

such liability should it be hereafter determined that Louis Delcambre, under whom they claim title, was entitled to the fruits and revenues, as usufructuary of the property; and, provided, further, that they shall in any event be entitled to set off as against said liability any claim which they may establish for expenses incurred in the preservation of said property, or in the making of useful improvements thereon, to the extent that the owner may be benefited.

It is further adjudged and decreed that there be judgment in favor of said Désiré and Laodice Delcambre, as plaintiffs in reconvention, and against the succession of Adelaide Landry in the sum of $900, being one-half of the various amounts, aggregating $1,800, awarded said plaintiffs in reconvention by the judgment appealed from, in reimbursement for certain improvements placed by them on the plantation in question, to wit, one pumping plant, six cabins, stable and shed, and boarding house and kitchen.

It is further decreed that the costs incurred in the district court on the main demand be paid·by defendants, and those incurred on the reconventional demand by plaintiff, and that plaintiff pay the cost of the appeal.

PROVOSTY, J., dissents.